JUDGE ~~~~~

OFFICE COPY

08 CV 00519

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

---

International Military and Government LLC,
a limited liability company,

                              Plaintiff,

     -against-

Plasan Sasa Ltd., an Israeli corporation,

                            Defendant.

Case No.



**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff International Military and Government LLC ("IMG"), by and through its attorneys, brings the following claims against Plasan Sasa Ltd. ("Plasan") and requests declaratory judgment, and in support thereof alleges as follows:

### Nature of the Action

1.    This is an action for breach of contract against Plasan. IMG is under contract with the United States government to manufacture armored vehicles for use by American troops. As a manufacturer of these vehicles, IMG requires timely delivery of component parts from its suppliers, including Plasan. Plasan has failed to deliver necessary parts at the times and in the amounts required under the Supply Agreement between Plasan and IMG. These repeated breaches have caused IMG significant monetary damages, and put in jeopardy the contract between IMG and the United States government. Because these vehicles, which protect soldiers from roadside bombs and improvised explosive devices, are of key importance to the safety of U.S. troops currently operating in war zones, the multiple failures of Plasan to provide the contracted materials have the ultimate effect of jeopardizing American lives.

2.    IMG also requests declaratory relief. The Supply Agreement between IMG and Plasan requires the parties to maintain the confidentiality of certain materials disclosed pursuant to the Agreement. By the plain language of the Agreement, the composite armor produced by Plasan under the Agreement does not fall within the definition of "confidential information" in the Agreement. Thus, IMG should be allowed to secure a secondary supplier

who can provide the necessary parts when Plasan fails to do so. Plasan disputes IMG's understanding and takes the position that the composite materials are "confidential information" as defined under the Agreement. IMG seeks a declaration from the Court as to the meaning of "confidential information."

### Parties

3.    IMG is a Delaware limited liability company, with its sole member being International Truck and Engine Corporation, a Delaware corporation with its headquarters located in Illinois. IMG manufactures vehicles for military use, including Mine Resistant Ambush Protected ("MRAP") vehicles. The MRAP vehicles are armored vehicles that are specifically designed to protect American troops from roadside bombs, improvised explosive devices, and similar weapons.

4.    Plasan is an Israeli corporation, with its headquarters in Israel. Plasan manufactures certain parts necessary for the construction of the MRAP vehicles. One of the parts manufactured by Plasan is the composite shell of the vehicle, which is the component that provides the external armored protection.

### Jurisdiction

5.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy is greater than $75,000.

6.    Venue is proper in this Court because both parties expressly consented to this venue in the Supply Agreement. See Supply Agreement, Ex. 2 at ¶ 54.

7.    An actual controversy exists under the meaning of 28 U.S.C. § 2201 such that this Court may determine the rights of the parties.

### Facts

8.    The Department of Defense contracted with IMG to purchase a number of MRAP vehicles for use by the armed forces (the "DoD Contract"). The DoD Contract requires IMG to produce certain numbers of MRAP vehicles on a defined production schedule. The DoD Contract is vital to the interests of the United States and, indeed, to the interests of American

soliders overseas. That central importance is reflected in the fact that the DoD Contract is rated at the highest level of priority under the Defense Priorities and Allocations System. This importance is further reflected in the strict delivery requirements to which IMG is subject under the DoD Contract.

9.      In 2006, Plasan provided IMG with engineering and development services related to the MRAP. That work was done pursuant to a Purchase Order dated December 13, 2006 (the "Purchase Order," attached hereto as Ex. 1). The Purchase Order was given and accepted under certain terms and conditions agreed to by the parties. Specifically, Plasan agreed that "all drawings, graphics, technical analyses, models, prototypes, writings, computer programs, algorithms, and other materials related to and emanating from work performed under this Agreement are considered to be works for hire and shall become and remain the property of International." Purchase Order, Ex. 1 at ¶ 3.

10.      Under the Purchase Order, Plasan further agreed that it would execute any documents requested by IMG "to assign to [IMG], its successors or assigns the sole and exclusive right to such designs, models, and other materials, as well as to design registrations, design patents and copyrights relating thereto." Id.

11.      Plasan and IMG executed a contract with an effective date of January 17, 2007, under which Plasan is to produce and deliver to IMG certain components of the MRAP vehicles, including the armored shell (the "Plasan Parts"). See Supply Agreement, attached hereto as Ex. 2. IMG's bid to the United States government for the DoD Contract was based in part on Plasan's bid to IMG as a sub-contractor and supplier of the Plasan Parts.

12.      Under the Supply Agreement, Plasan is obligated to provide certain numbers of the Plasan Parts by certain dates. Plasan's compliance with the Supply Agreement is vital to IMG's ability to comply with the DoD Contract. Plasan has breached the Supply Agreement by failing to deliver the Plasan Parts in the necessary amounts and by the dates specified in the Agreement.

Plasan's Obligations Under the Supply Agreement

13.     The Supply Agreement requires Plasan to "sell to [IMG] one hundred percent (100%) of the Products ordered by [IMG]." See Ex. 2 at ¶ 4(A). It further states that "[s]hipments of Products by [Plasan] must equal the exact quantity ordered by [IMG]." See id. at ¶ 4(G). Incorporated into the Agreement by reference are certain purchase orders, which provide detailed parts orders and related delivery schedules.

14.     Plasan also must meet the delivery schedules specified in the Supply Agreement and the integrated purchase orders: "[Plasan] is required to meet all cost, performance, delivery, reliability, quality and technology requirements, and documentation thereof, as specified in this Agreement." See id. at ¶ 18. Plasan acknowledged that IMG "requires on-time delivery in order to operate its plants and parts distribution centers." Id. at ¶ 23(A).

15.     Under the Supply Agreement, Plasan agreed that it is "required to have Product staged for delivery and paperwork accurately prepared to support the freight carrier's prearranged pick-up time….[Plasan] is responsible for paying any additional reasonable transportation charges billed by the freight carrier as a result of [Plasan's] failure to have Product staged for delivery and paperwork accurately prepared." See id. at ¶ 2(B).

16.     Plasan is also required to pay express charges, if IMG determines that Plasan's deliveres are "so far behind a given schedule" that express shipments are required. Id. at ¶ 21.

17.     Plasan is further required to "advise IMG immediately in writing of any apparent imminent problem" with respect to delivery failures so that IMG can "avoid any actual assembly line downtime." Id. at ¶ 23(A).

18.     Failure by Plasan to make timely or conforming delivery of the products is subject to a liquidated damages clause in the Agreement. See id. at ¶ 23(A). Other obligations under the Agreement, however, including Plasan's agreement to notify IMG of any imminent delivery problems and Plasan's promise to pay express delivery charges, are not subject to the liquidated damages provision. Id.; see also id. at ¶ 45(i) (stating that application of the liquidated

damages provision is limited to certain breaches).

19.     Plasan agreed under the Supply Agreement that IMG "would be damaged irreparably" if the terms of the Agreement were not performed or were breached. Id. at ¶ 56. Pursuant to that agreement, Plasan acknowledged that IMG is "entitled to an injunction or injunctions to prevent breaches of the provisions" of the Agreement and "to enforce specifically" the Agreement. Id.

### Plasan's Breaches of the Agreement

20.     For each month since the Agreement began, Plasan has failed to deliver the ordered Parts on the required schedule. Instead, Plasan has consistently delivered the Plasan Parts substantially late, and often Plasan has delivered fewer parts than were ordered.

21.     Plasan has never provided IMG with written notice of any imminent delay in delivery, as is required under the Supply Agreement. In contrast, as required under the Supply Agreement, IMG has notified Plasan of its non-compliance with the Supply Agreement in writing, and Plasan has failed to cure its non-compliance.

22.     As a result of Plasan's repeated breaches of the Supply Agreement, IMG has been forced to incur considerable expense in order to meet IMG's own obligations to the United States government. IMG has also incurred significant overheard costs required to keep its production facilities operating around the clock due to the late delivery of Plasan Parts.

23.     IMG has notified Plasan on multiple occasions of Plasan's breaches, and has attempted to work with Plasan to address the problems with delivery. Because of the paramount importance of the DoD contract to the United States government and its soldiers, as well as to IMG, IMG cannot accept Plasan's failures as the regular course of business.

### Lack of Confidentiality of the Composite Armor

24.     The Purchase Order specifically states that all materials related to and emanating from the MRAP project "shall become and remain the property of International." See Ex. 1 at ¶ 3. Since at least December 2006, all materials produced by Plasan and sold to IMG are the sole property of IMG. Plasan further agreed that it would assign all rights to those materials

to IMG.  Id.

25.    The Supply Agreement provides that during the course of the Agreement, either party

> may disclose to the other certain confidential information relating to the manufacturing, sale, marketing, development or distribution of the Product(s), the application of the Product(s) by [IMG], processes, trade secrets and business and financial information and marketing plans of either party as well as confidential information…resulting from the performance of this Agreement.

Supply Agreement, Ex. 2 at ¶ 49(A).  Information is considered "confidential" if it is "marked or otherwise clearly identified at the time of disclosure as 'confidential' or proprietary'" or is "information which a person would reasonably deem to be confidential information of the parties under the circumstances."  Id.

26.    The parties to the Supply Agreement "shall not disclose" the confidential information of the other party to third parties, and shall use "best efforts" to protect the confidentiality of the information.  Id.

27.    Under the Supply Agreement, IMG and Plasan also agreed that confidential information did *not* include information which "is or becomes publicly known through no wrongful act on the receiving party's part."  Id.

28.    The Plasan Parts, including the armored shell, were not identified by Plasan as "confidential information" as that term is defined in the Supply Agreement.

29.    The Plasan Parts, including the armored shell, have been sold to third-parties who are not subject to the Supply Agreement.  The armored shell of the vehicle has been sold by IMG to the United States government as part of the MRAP vehicles.  The MRAP vehicles are used publicly throughout the world.

30.    The parties agreed and understood that under the Supply Agreement the Plasan Parts would be sold to a third party who was not a party to the Supply Agreement.  See id. at ¶ 1.  Indeed, the Supply Agreement specifically references the DoD Contract and states that IMG's proposal to the United States government was based on Plasan's offer to IMG for the

parts. Id. It was the express understanding of the parties that the armored shell of the vehicle, along with the other Plasan Parts, would be resold by IMG to the United States government. Id.

### First Cause of Action
### (Breach of Contract)

31.    IMG incorporates by reference as if fully set forth herein Paragraphs 1 through 29 of this Complaint.

32.    The Supply Agreement is a valid and enforceable contract.

33.    IMG has performed all its obligations under the Supply Agreement.

34.    Plasan has breached the Supply Agreement by its repeated failures to deliver the ordered parts in accordance with the delivery schedule; by failing to notify IMG of imminent delays in delivery; and by failing to reimburse IMG for the enhanced delivery costs associated with late production of the parts.

35.    IMG has been damaged by Plasan's breach of the Supply Agreement.

### Second Cause of Action
### (Declaratory Judgment)

36.    IMG incorporates by reference as if fully set forth herein Paragraphs 1 through 34 of this Complaint.

37.    IMG is the sole and exclusive owner of the Plasan Parts and all related designs, models, technical analyses, prototypes, writings, computer programs, algorithms, and any other materials related to the MRAP vehicles.

38.    Plasan agreed to assign sole and exclusive rights to all materials related to the MRAP project to IMG.

39.    The armored shell of the MRAP vehicles, as well as the other parts supplied by Plasan pursuant to the Supply Agreement, are not "confidential information" as that term is defined in the Agreement.

40.    The Plasan Parts were not identified by Plasan as "confidential information."

41.    Plasan had no expectation that the parts would be kept confidential by

IMG, as the Supply Agreement specifically stated that the parts would be resold to the United States government and incorporated into vehicles that are used visibly throughout the world.

42.    On information and belief, Plasan denies that IMG is the sole and exclusive owner of the Plasan Parts and denies that the Plasan Parts are not "confidential information."

43.    Under 28 U.S.C. § 2201, an actual controversy exists.

44.    This Court should issue a declaratory judgment that IMG is the sole and exclusive owner of the Plasan Parts and that the Plasan Parts are not "confidential information."

<u>PRAYER FOR RELIEF</u>

WHEREFORE, IMG demands as follows:

1.    Judgment against Plasan and in favor of IMG in a sum equivalent to the liquidated damages amount as specified in the Supply Agreement for each breach of the Supply Agreement by Plasan;

2.    Judgment against Plasan and in favor of IMG in a sum equivalent to IMG's actual damages flowing from Plasan's breaches of the Supply Agreement, in an amount to be proven at trial, plus interest, attorneys' fees and costs;

3.    Injunctive relief in the form of preliminary and permanent injunctions ordering Plasan to specifically perform its obligations under the Supply Agreement and enjoining Plasan from further breaches of the Agreement;

4.    A declaration that

a.  the Plasan Parts are the sole and exclusive property of IMG;

b.  the Plasan Parts are not "confidential information" as that term is defined in the Agreement;

c.  that IMG is within its rights under the Agreement to secure a secondary supplier of the Plasan Parts to ensure that IMG can comply with the DoD Contract.

5.    Any other relief the Court deems warranted.

Dated:        January 18, 2008                    By: _____

One of the Attorneys for IMG

Christopher Harris (CH-6513)
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, New York 10022
Telephone: (212) 906-1200
Facsimile:  (212) 751-4864

Cary R. Perlman
Cameron R. Krieger
LATHAM & WATKINS LLP
233 South Wacker Drive, Suite 5800
Chicago, Illinois  60606

# EXHIBIT 1

JAN. 5. 2008  2:58PM    IMG                                    NO. 452   P. 2



**International Military & Government LLC**

To:  **PlasanSasa**
ATTN: Dani Ziv
Kibbutz Sasa
M.P. Merom Hagalil
13870 Israel

# Purchase order

PO Number ..............: 030357
Supplier Code ...........: 000257
Date ......................: 12/13/2006
Revision No .............: 2
FOB Point ...............:
Terms ....................: Net 30 Days
Tax Status ..............: EXEMPT FOR EXPORT
Country ..................:
Posted By ...............: Dan Leek

| Description | Delivery | Quantity | Price each | Amount |
|---|---|---|---|---|
| To cover engineering and development services associated with past and future MXT and IMPV vehicles | 12/13/2006 | 1.00 | 500,000.00 | 500,000.00 |

Grand Total:    500,000.00 USD

JAN. 5. 2008  2:58PM  IMG                                    NO. 452   P. 3



**International Military & Government LLC**

## SPECIAL DESCRIPTION

Truck Order No .........:
Chassis Description ....:
Account # ...............: 1331414TN0-N8
Appropriation # ..........: In Ref to.
Cost Center ............: 7495100001-TUSG
Chassis Numbers .......:

Special Comments ......: MXT and IMPV

- This order is given and accepted only subject to all conditions herein and printed on the reverse hereof.
- When the units or goods are completed and ready, please notify the individual listed below.
- Please show P.O. No. and international truck order no. on supplier invoices.
- Please mail invoice with a copy of this P.O. to : International Truck and Engine Corporation,
   Attn ......: Dan Leek
              4201 Winfield Road
              Warrenville, IL 60555
              USA

By : (Printed Name) .: Dan Leek              Ph ......: 630-753-2571

By: (Signature) .......:                     Date ...: 12/13/2006

Director of Finance Military or Purchasing Manager (Signature):              Date ...: 12/13/06
                          (If Applicable)

## ADDITIONAL CONTRACT SERVICES TERMS AND CONDITIONS

The following terms and conditions, together with those appearing in the Buyer's Purchase Order shall exclusively govern the order between International Truck & Engine Corp. (hereinafter referred to as International), and "Contractor" (as listed on the purchase order). Unless expressly agreed to in writing by Buyer, no additional or different terms and conditions appearing in any instrument from Seller shall be binding upon Buyer. In the event of any contradicting terms and conditions, Buyer's terms and conditions shall take precedent.

1.  In consideration of Contractor rendering services to International, Contractor shall be paid as terms of payment are listed on the Purchase Order. Contractor shall submit to International an invoice of compensation due at the completion of the project. Completion of Services is defined as the completion of testing by International personnel where no errors in calculations or printed output were discovered.
    Reimbursable expenses such as travel, lodging, meals, materials, supplies and outside services will be billed at actual cost and substantiated by copies of invoices covering these charges. International travel policy will apply where applicable and no expenses will be reimbursed without the prior written approval of International.

2.  Contractor agrees to communicate to International all inventions, discoveries, computer programs, algorithms, technical data and information resulting from this project made or conceived by Contractor or its employees in behalf of International solely or in collaboration with international personnel during the term of the agreement, and they shall become and remain the property of International. At the request of International, Contractor shall execute or cause its employees to execute any and all documents which International may deem necessary to assign or to convey to it, its successors or assigns, the sole and exclusive right, title, and interest in and to such inventions, discoveries, and improvements in any Letters Patent therefor.

3.  Contractor agrees that all drawings, graphics, technical analyses, models, prototypes, writings, computer programs, algorithms, and other materials related to and emanating from work performed under this Agreement, are considered to be works for hire and shall become and remain the property of International. At the request of International, Contractor shall execute or cause its employees to execute, any, and all documents which International may deem necessary to assign to it, its successors or assigns the sole and exclusive right to such designs, models, and other materials, as well as to design registrations, design patents and copyrights relating thereto.

4.  Contractor further agrees that it will not knowingly infringe the patent, copyright, or trade secret rights of third parties in the performance of this agreement and agrees to advise International if Contractor is or becomes aware that International's use of the results of this project would violate rights of third parties.

5.  International and Contractor agree not to disclose to any third party or use, except in connection with specific International assignments, any confidential information relating to the other party's (disclosing party) or the disclosing party's suppliers' processes, products, equipment, or trade secrets as well as confidential information resulting from this project. Any information not available to the public shall be considered confidential for the purposes of this agreement, but should any of this information be published or otherwise made available to the public by the disclosing party or by third parties without breach of this agreement, the receiving party shall be free to use for its own purposes such publicly available information.

6.  All materials, including without limitation, documents, drawings, models, sketches, designs, computer tapes and disks, and lists furnished to receiving party by disclosing shall remain the property of disclosing party and shall be returned promptly upon completion of the assigned project or at any time upon written request of disclosing party. Receiving party agrees not to make any copies of any such materials without disclosing party's permission and to return any copies authorized with the original materials.

7.  Contractor warrants that it has entered into agreements with its employees, and all persons who will be involved in the performance of Contractor's obligations under this agreement,

8.  having terms obligating such employees or persons to contract in the same manner and to the same extent that Contractor is obligated to International under paragraphs 3, 4, 5, 6 and 7 hereof. Both parties will ensure that each person with access to Technical Data, as defined in 22 CFR Section 120.10, Defense Services as defined in 22 CFR Section 120.9, and Defense Articles as defined in 22 CFR Section 120.6, provided by one party ("Disclosing Party") to the other party ("Receiving Party") (collectively "ITAR Materials") is eligible to be granted access to such ITAR Materials pursuant to 22 CFR Section 120.1(c) or is a U.S. Person as defined in 22 CFR Section 120.15. In instances where Foreign Persons, as defined in 22 CFR Section 120.16 have access to ITAR Materials, the Receiving Party shall immediately provide the Disclosing Party with a copy of the license or approval at the time that the Receiving Party provides such Foreign Person with access to the ITAR Materials.

9.  Contractor agrees to comply with all applicable statutes, regulations, laws and other Government requirements, including but not limited to, 48 C.F.R. Sections 52.219-8 (Utilization of Small Business Concerns), 52.222-26 (Equal Employment Opportunity), 52.222-35 (Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans), 52.222-36 (Affirmative Action for Workers with Disabilities), 52.222-39 (Notification of Employee Rights Concerning Payment of Union Dues or Fees), 52.222-41 (Service Contract Act of 1965) and 52.247-64 (Preference for Privately Owned U.S.- Flag Commercial Vessels). Contractor also agrees to comply with all FAR flow down provisions of any Government bid under which International engages Contractor's Services to support under this Agreement.

9.  Contractor warrants that any systems or components created for, leased to, or developed for International under this Agreement shall conform with all the requirements of International's published specifications and associated documentation.

10. Any proposed release by Contractor to the public relating to this project whether or not it contains any confidential information therein must, prior to release thereof,      be approved in writing by International.

12. Contractor agrees to indemnify and hold International harmless from any and all claims or losses arising out of Contractor or its agents' use of International's facilities or equipment.

13. Contractor specifically acknowledges that it is an independent contractor and that neither it nor any of its employees is entitled to participate in any of International's  benefit plans, including without limitation: vacation, disability, life insurance, S.U.B., attendance bonuses, pre-retirement leave, pension and annuity, accidental      death and dismemberment, hospital, surgical, or medical benefits.

14. Contractor agrees, as an independent contractor, to perform the assignments set forth herein on a best effort basis in a timely manner and shall not be International's agent nor have any right, authority or power to enter into any commitments on behalf of International unless specifically authorized by International in writing.

15. Contractor shall carry Workman's Compensation, public liability and auto insurance in amounts of $5,000,000 for bodily injury and property damage with an insurance company satisfactory to International. A certificate of insurance coverage will be supplied to International prior to proceeding with the work.

16. International reserves the right to stop any and all work being performed by Contractor on this project at any time. International will pay for all work performed by Contractor through the end of the work day of the day work is stopped.

17. Contractor may not subcontract any of the services to be performed hereunder without the prior written consent of International.

18. For cost control purposes, all changes and additions to scope of work shall be made in writing. Contractor shall advise International of the additional costs and time required and proceed only after written authorization has been received by a modification to this contract.

20. This agreement shall be construed in accordance with the laws of the State of Illinois, USA.

# **EXHIBIT 2**







**SUPPLY AGREEMENT**

**INTERNATIONAL TRUCK AND ENGINE CORPORATION**
**AND**
**PLASAN SASA LTD.**

| PLASAN**sasa** | *MaxxPro MRAP Program* | |
| Composite Materials | **Contract No: M67854-07-D-5032** |  |
| | **Supply Agreement** | |

## Table of Contents

INTERNATIONAL TRUCK AND ENGINE CORPORATION.................................................1

**TERMS**....................................................................................................................**4**
1.      TERM OR AGREEMENT.....................................................................................4
2.      FREIGHT..............................................................................................................4
3.      PAYMENT TERMS..............................................................................................4

**PRODUCT**.............................................................................................................**5**
4.      PRODUCT TERMS...............................................................................................**6**
5.      PRICING...............................................................................................................6
6.      MATERIAL CLAUSE...........................................................................................7
7.      SERVICE PARTS AVAILABILITY.......................................................................8
8.      PACKAGING AND PACKING.............................................................................8
9.      LABELING............................................................................................................8
10.     VOLUMES............................................................................................................9
11.     TOOLING.............................................................................................................9
12.     PRODUCT INPROVEMENTS / COST REDUCTION..........................................9
13.     FORCED SELLER CHANGES, OBSOLESCENCE, AND NEW PRODUCTS.......10
14.     PRODUCT REGUALTORY COMPLIANCE.........................................................10
15.     PRICING, QUANTITY, REBATE AND FREIGHT DISPUTES.............................10
16.     INSPECTION OF PRODUCTS............................................................................11
17.     (RESERVED)........................................................................................................11

**SELLER PERFORMANCE**....................................................................................**12**
18.     PERFORMANCE ACHIEVEMENT.....................................................................**12**
19.     (RESERVED)........................................................................................................12
20.     SUPPLY FAILURE................................................................................................12
21.     LATE DELIVERY CHARGES...............................................................................12
22.     (RESERVED)........................................................................................................12
23.     REIMBURSEMENT FOR NON-PERFORMANCE BY SELLER...........................12
24.     WARRANTY.........................................................................................................13
25.     WARRANTY CLAIMS; SERIAL DEFECTS..........................................................13
26.     FINANCIAL VIABILITY.......................................................................................14
27.     (RESERVED)........................................................................................................15
28.     (RESERVED)........................................................................................................15
29.     (RESERVED)........................................................................................................15
30.     VALUE SELLING..................................................................................................15

**ENGINEERING/TECHNICAL SUPPORT**...............................................................**15**
31.     (RESERVED)........................................................................................................**15**
32.     COMPLIANCE WITH CONTROLLED REVISIONS OF ENGINEERING.............15
33.     ENGINEERING SPECIFICATION AND PRODUCT COMPLIANCE.....................15
34.     TRUCK ENGINEERING CAD/CAM SUPPLIER DESIGN DATA REQUIREMENTS...16
35.     (RESERVED)........................................................................................................17
36.     INFORMATION TECHNOLOGY.........................................................................17
37.     QUALITY REGISTRATION..................................................................................17

**LEGAL/REGULATORY**........................................................................................**17**
38.     COMPLIANCE WITH LAWS AND REGULATIONS............................................**17**
39.     NON-COMPLIANCE CHARGES..........................................................................17
40.     MATERIAL SAFETY DATA SHEETS (MSDS)/SUBSTANCE RESTRICTIONS......17
41.     (RESERVED)........................................................................................................17
42.     (RESERVED)........................................................................................................18
43.     GOVERNMENTAL REQUIREMENTS.................................................................18

| PLASAN**sasa**<br>Composite Materials | *MaxxPro MRAP Program*<br>**Contract No: M67854-07-D-5032**<br>**Supply Agreement** |  |
|---|---|---|

44.    DIRECT PAYMENTS......................................................................................................
45.    INDEMNIFICATION....................................................................................................18
46.    LIABILITY INSURANCE...............................................................................................18
47.    REMOVAL OF IDENTITY OF BUYER.........................................................................20
48.    NEW BUSINESS.........................................................................................................21
49.    CONFIDENTIAL INFORMATION/INTELLECTUAL PROPERTY..................................22
50.    TERMINATION...........................................................................................................22
**MISCELLANEOUS**...............................................................................................................**23**
51.    ASSIGNMENT OF RIGHTS AND DUTIES.................................................................**24**
52.    MODIFICATION AND AMENDMENT OF AGREEMENT.............................................24
53.    CHOICE OF LAW.......................................................................................................25
54.    CONSENT OF JURISDICTION...................................................................................25
55.    SEVERABILITY...........................................................................................................25
56.    NO LIMITATION OF RIGHTS AND REMEDIES; SPECIFIC PERFORMANCE...................25
57.    FORCE MAJEURE.......................................................................................................26
58.    ENTIRE AGREEMENT.................................................................................................26
59.    NOTICES....................................................................................................................27
60.    NO WAIVERS.............................................................................................................27
61.    CONSTRUCTION........................................................................................................28
62.    HEADINGS.................................................................................................................29
63.    COUNTERPARTS........................................................................................................29
APPENDIX A – STATEMENT OF WORK..............................................................................29
APPENDIX B – PURCHASE ORDERS...................................................................................31
APPENDIX C – DELIVERY SCHEDULE.................................................................................70
APPENDIX D – PRICE LIST.................................................................................................71
APPENDIX E – FORMS; COS; PACING LIST; INVOICE.......................................................72
APPENDIX F – FAR AND DFAR CLAUSES..........................................................................81
APPENDIX G – PACKAGING; LABELING PROCEDURES......................................................84
APPENDIX H – BEST COMMERCIAL PRACTICES................................................................87
APPENDIX I – NON-CONFORMANCE CHARGE SCHEDULE.................................................91



| | MaxxPro MRAP Program | |
|---|---|---|
| | **Contract No: M67854-07-D-5032** |  |
| | **Supply Agreement** | |

## TERMS

**1.**    **TERM OF AGREEMENT**

This Supply Agreement (the "**Agreement**") between <u>INTERNATIONAL MILITARY AND GOVERNMENT LLC</u>, a Limited Liability Company, 4201 Winfield Road, Warrenville, IL 60555 (the "**Buyer**") and <u>PLASAN SASA Ltd.</u>, <u>an Israeli</u> corporation, Kibbutz Sasa, Merom Hagalil, 13870 Israel (the "**Seller**"), dated January 17, 2007 (the "**Effective Date**").  This Agreement is effective as of the Effective Date.

The Buyer has received an order (Contract No. M67854-07-D-5032) for 1,200 Category 1 (Delivery Order No. 2) and for 17 Category 2 (Delivery Order No. 3) Mine Resistant Ambush Protected (MRAP) Vehicles Low Rate Initial Production (LRIP) Vehicles from the Department of Defence (DoD) (the "**Prime Contract**") through its contracting officer (the "**Customer**") The Buyer's proposal to the Customer was based on the Seller's offer quotation no. PQ-MRAP-007(b) (the "**MRAP Project**").

The Sellers offer was for an armor protection product for CAT I (the "**CAT I Product**") and an armor protection product for CAT II (the "**CAT II Product**") each more fully described in the Statement of Work attached hereto as **Appendix A** (and collectively referred to as the "**Products**").

The Buyer hereby orders from the Seller under the MRAP Project the sale and supply of 3 prototypes of CAT I Product (PO No. 30427) and 4 prototypes of CAT II Product (PO. Nos.30399 and 30427) (the "**Prototypes**") including integration of the NBC, FSS, electrical harnesses and hydraulic systems (PO. No. 30399 and 414000000000024) (the "**Integrations**"); and 1,200 the CAT I Products and 17 CAT II Products , out of which the Buyer has already issued the POs listed in **Appendix B** attached hereto (the "**Initial POs**"). The 1,224 Products shall be delivered to the Buyer in accordance with the Schedule attached hereto as **Appendix C** (the "**Delivery Schedule**").

The Seller shall from time-to-time issue releases, in accordance with the terms contained herein, with respect to each line item of the BOM for the Products, in quantities and delivery dates matching the Delivery Schedule (the "**Releases**"). The terms hereof shall apply to Initial POs and the Releases and the terms contained therein shall not apply and shall be disregarded.

**2.**    **DELIVERY; FREIGHT**

A.    Seller agrees to use only those freight carriers specified in writing by Buyer.  Buyer must approve in writing any other freight carriers used by Seller prior to shipment. The terms of delivery for all Products (as defined below) sold pursuant to this Agreement shall be ex works Sellers plant (F.O.B. suppliers plants for Seller's US subcontractors).

B.    Seller is responsible for following Buyer's routing instructions and handling all transportation activities efficiently and effectively.  Specifically, Seller is required to have Product staged for delivery and paperwork accurately prepared to support the freight carrier's prearranged pick-up time. Seller is responsible for paying any



| | MaxxPro MRAP Program | |
|---|---|---|
| | **Contract No: M67854-07-D-5032** |  |
| | **Supply Agreement** | |

additional reasonable transportation charges billed by the freight carrier as a result of Seller's failure to have Product staged for delivery and paperwork accurately prepared. Buyer expects Seller to settle properly documented charges promptly.  Seller's failure to do so will result in freight debits to Seller.

**3.**      **PRICE; PAYMENT TERMS**

A.      The price payable to the Seller for each Product is specified in the price list attached herewith as **Appendix D** (the "**Price List**") and the total contract price hereunder is US$221,434,703 plus additional prices for subsystems also provided in Appendix D (the "**Contract Price**"), subject to changes to be agreed upon in accordance with Article 4C below.

B.      The Contract Price shall be paid as follows:

(i)      Performance Based Payment (PBP) / Advance Payments: The Buyer shall request performance based payments from the Customer in accordance with the Prime contract (FAR 52.232.32, Performance Based Payments).

a.    The Buyer shall provide advance payments to the Seller either funded / financed through the Buyer or through the Government via PBP.  Under no circumstance will the cumulative funding be in excess of the Seller's substantiated PBP requests. Other than cases of termination of this agreement for Seller's default as provided for in Article 50, the Buyer shall unconditionally pay the Seller the following three advanced payments.
  i.    Payment Schedule
    1.  $20 Million Aug. 1, 2007
    2.  $21 Million Sept. 3, 2007
    3.  $20.9 Million Oct. 1, 2007

b.    The Seller shall provide the Buyer adequate (supportable and auditable) documentation establishing the Seller's obligations towards the Seller's suppliers and subcontractors justifying the Seller's request for PBP.

c.    The Buyer shall submit the PBP request and work with the governmental agencies to ensure acceptance of the PBP.  The Seller shall support the Buyer in this effort.

C.    The balance of the Contract Price (the "Balance") shall be made based upon deliveries of Products (including partial deliveries thereof).  The Balance Payment will be equal to the



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



purchase price payable for the Products delivered less a pro rated portion of the Performance Based Payment or Advance Payment  Each payment to be paid net forty five (45) days from the last to occur of the following: (i) Buyer's receipt from Seller of a correct invoice, Certificate of Compliance ("COC") signed in accordance with Section 16 below and packing list all in accordance with the forms attached hereto in Appendix E; and (ii)  the date of delivery of the Products in accordance with Article 2 above.

D.  Should the Buyer fail to effect payment according to the schedule mentioned above and failed to cure the non-conformance within a reasonable time which shall not be longer than 15 days from receipt of Seller's notice, then:

    a.  If payments are not received by Seller from Buyer based upon the advance payment schedule above then Seller may withhold further deliveries until Buyer issues payment; or

    b.  If payments are not received by Seller from Buyer, based upon product deliveries and the payments in question are in excess of $10 million, Buyer will incur late penalties of 0.4% of the outstanding payments in question but not to exceed $40,000 per week.

## PRODUCT

## 4.  PRODUCT TERMS

A.  During the term of this Agreement, Buyer shall purchase from Seller, and Seller shall sell to Buyer, one hundred percent (100%) of the Products ordered by the Buyer under this Agreement as detailed in Appendix A, or as they may be hereafter improved or modified if such improvements and modifications are approved by Buyer in accordance with Section 4C below.

Seller shall also, at Buyer's sole option, sell Products to Buyer's subsidiaries, affiliates, third party contractors or any other Buyer designated party in conjunction with this Agreement (Third Party Designee), under the same terms and conditions as set forth in this Agreement. All of Seller's representations, warranties and obligations under this Agreement apply to sales to Third Party Designees provided the Third Party Designee shall issue an applicable Release to the Seller and the Seller accepted receipt thereof, such Releases also to be governed by this Agreement.

B.  Seller hereby further agrees to sell to Buyer all Product related services and related materials, including, without limitation, sequencing, painting, warehousing, packaging, containers, necessary software, and any and all literature pertaining to such Products and which service and materials are requested by Buyer as separate line items in the POs.

C.  Buyer reserves the exclusive right at any time to make changes or modifications to the drawings and specifications of any Products, materials, or work covered by this Agreement which are designed by Buyer, or are uniquely designed or created for Buyer.  Any difference in price or time for performance resulting from such changes



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



shall be equitably adjusted, and the Agreement shall be amended and modified in writing accordingly. Each party shall have the right to request changes to the Products, by delivering a written change request to the other party detailing the required changes (the "**Change Request**"). Where the Buyer issued the Change Request, then the Seller shall provide written notice to the Buyer (the "**Amendment Notice**") detailing the effects of the changes requested to the delivery schedule, price, specifications or any other term contained herein (the "**Amendments**"). Each party shall respond to the other Party's as soon as practicable possible but in no event more then 30 days from receipt of the other Party's application. If the Buyer fails to provide written notice of its acceptance of the Amendments proposed by Seller in the time provided herein, then it shall be deemed to have rejected the Amendments and the Change Request and Amendment Notice (if applicable) shall have no further effect following expiration of the relevant notice period. If the Buyer accepts the Amendments or any part thereof in writing in the time provided, then the Change Request and the Amendment Notice (if applicable) shall form a legally binding amendment to the Agreement. Should the parties fail to agree they shall conduct good faith negotiations to agree to the applicable terms. Unless specifically instructed otherwise, the Seller shall continue all works, until the Change Request procedure described herein is completed.

D.    During the Term of this Agreement, Seller shall not sell, give, transfer or in any way cause to be or facilitate to be manufactured or sold the Products or any derivatives of Products identified in Appendix A of this Agreement and any Products sold to Buyer under this Agreement to any other party other than Buyer, unless expressly authorized in writing by Buyer.

E.    Seller may not contract or sub-contract for any third party to perform this Agreement without prior written agreement of Buyer, but the Seller shall be entitled to engage third party sub-contractors with respect to parts of this Agreement without prior consent.

F.    Seller hereby agrees to provide to the Buyer service parts for Products solely to the Buyer or in accordance with the Buyer's instructions.

G.    Shipments of Products by Seller must equal the exact quantity ordered by Buyer, unless otherwise agreed to in writing by Seller and Buyer. Shipping schedules may contain authorization by Buyer to the Seller to fabricate within a time specified quantities of Products under this Agreement, the delivery of which has not been specified by Buyer. A shipping schedule may also contain authorization by the Buyer to the Seller to acquire within a specified period of time materials necessary to fabricate a certain quantity of the Products under this Agreement. Such authorizations and instructions shall form and be considered as a separate line item in the Release.

**5.        PRICING**

A.    <u>Similar Pricing for Production Products and Service Parts</u>.  Products used for OEM production vehicles ("Production Products"), Products used to service previously sold Production Products (i.e. spare parts) ("Service Parts"), and packaging, if applicable, shall be quoted and priced by Seller to Buyer at  equivalent pricing levels. As Products



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



cease being placed in Buyer's OEM production vehicles, Seller shall continue to provide the pricing level for Service Parts at prices to be agreed between the parties. Seller to provide to Buyer, individual part pricing that sums to the price of a kit (Appendix D). This pricing level is needed to supply the Customer with individual parts pricing.

B.   Evidence of Cost to Buyer. Seller's obligations to evidence price shall be as per the applicable FAR, if any, quoted in the applicable PO.

C.   Pricing of Products. Pricing for Products shall under no circumstances exceed pricing of similar products (i.e. armoring answering the same specifications, for identical quantities and terms of engagement) to Seller's Parts Distributors or any other customers of Seller in the United States, which is a competitor of Buyer.

D.   Prices for all Products shall be set forth in Appendix D attached hereto.

## 6.   MATERIAL CLAUSE

All prices for the Products as set forth in **Appendix D** attached hereto are firm and fixed for the manufacture, sale and delivery of the Products, Prototypes, CAT I Hydraulics, CAT II Hydraulics and implementation of Integrations in the quantities stated herein. Prices for repeat orders, including without limit, orders of spare parts shall be subject to negotiation between the Parties and will take into account, amongst other things, fluctuations in the prices of raw materials and site of production. Seller must provide adequate supporting documentation regarding cost fluctuations.

## 7.   SERVICE PARTS AVAILABILITY

A.   Service Parts for the Products covered by this Agreement will be furnished and combined with Buyer's Production Product orders. If Buyer ceases production of any product incorporating a Product covered by this Agreement, Seller shall continue to maintain the tools, jigs and fixtures at no charge to Buyer, and sell to Buyer the Products necessary to satisfy Buyer's past model service and replacement requirements for Product for a minimum of fifteen (15) years after cessation of production.

B.   In addition, upon termination or expiration of this Agreement, Buyer shall have the opportunity for a one-time buy of Products by Buyer to fulfill such service and replacement requirements. Buyer and Seller shall negotiate in good faith with respect thereto.

## 8.   PACKAGING AND PACKING

A.   All packaging and shipping shall be done in accordance with Seller's standard commercial procedures, to be reviewed and agreed to by Buyer, described in **Appendix G** attached hereto.



| | MaxxPro MRAP Program |
| --- | --- |
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



B.    Interpretation of packaging specifications and determination of market competitive packaging costs and pricing will be coordinated between Buyer's and Seller's Corporate Packaging staffs.

C.    If returnable containers are required by Buyer, container and transportation costs therefore will be negotiated in good faith between Buyer and Seller.

D.    Seller will adhere to all retail-packaging regulations of the United States. This includes but is not limited to federal, state, provincial, county, city, and other applicable laws, regulations and statutes.

E.    Seller will adhere to all hazardous material packaging regulations of the United States where the Products will be sold. This includes but is not limited to federal, state, provincial, county, city, and other applicable laws, regulations and statutes.

F.    In support of Buyer's lean manufacturing goals, Seller will adhere to requested standard packs with standard shipping quantities. Should additional costs apply, they will be negotiated by the parties.

**9.    LABELING**

All labeling shall be done in accordance with Seller's standard commercial procedures, to be reviewed and agreed to by Buyer, described in **Appendix H** attached hereto.

**10.    VOLUMES**

Quantities contained in Releases accepted by the Seller shall be binding on the Buyer.

**11.    TOOLING**

A.    All dies, tools, gauges, fixtures, and patterns necessary for the production of the Products ordered belong to the Seller. Should there be a need to provide for additional tooling that shall be paid for by the Buyer, then the Buyer shall have the right to have its tools department inspect those specific tools. All tooling, jigs, fixtures and associated manufacturing equipment necessary for the successful production and testing of the Products for which Buyer pays Seller in full will remain the exclusive property of Buyer, and Seller assumes all liability for any loss, damage or shortage and/or for Seller's failure to return such property, including equipment, to Buyer upon request.  The tooling which is owned by Buyer and maintained by Seller shall be in accordance with the terms of the attached Tooling and Bailment Agreement.  Seller shall promptly notify Buyer of any such loss, damage or shortage.  Such tooling items must be identified and labeled as "Owned By International".  Furthermore, all tooling owned by Buyer shall be used exclusively for the manufacture of Products for Buyer. Seller will perform normal maintenance, at Seller's expense, for the duration of this Agreement.

B.    Tooling developed for the production of the Products that are paid for by the Buyer will conform to Buyer's product development guidelines.  It is expected that Seller will



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



exercise due care and judgment in the design, specification, sourcing, building, and supervision of building, of all tooling paid for by the Buyer in such a way to maximize production efficiency and minimize cost. Seller will analyze domestic and overseas placement of tooling using various cost, part and tooling design, and timing requirements. In those instances where Buyer has an obligation to pay for tooling costs, Buyer will pay Seller only for those costs deemed to be globally competitive in cost and quality by Buyer agreed upon in the relevant PO. Tooling costs paid for by the Buyer may be shared with Seller or amortized as mutually agreed upon by both parties in writing. If Seller pays for tooling and amortizes cost to Buyer as described in the attached Amortization Agreement, upon completion of amortization Buyer shall have the option to purchase all such tooling from Seller for the price of one dollar ($1.00).

## 12.    PRODUCT IMPROVEMENTS / COST REDUCTION

A.  Seller and Buyer are committed to an active product cost reduction program. Any Buyer-initiated cost savings resulting from product improvements and/or design changes shall be shared fifty-fifty (50%/50%) with Seller after funding total cost of initial tooling investment.

B.  Seller-initiated cost savings done in conjunction with the Buyer, resulting from source changes or negotiations with current sources, shall be shared fifty-fifty (50%/50%) with Seller after funding total cost of initial tooling investment

## 13.    FORCED SELLER CHANGES, OBSOLESCENCE, AND NEW PRODUCTS

A.  Seller shall retain its production capability for similar products to the Products after completion of the deliveries hereof. Commencement of production of the Products shall be subject to separate written agreement of the parties. Buyer will work in good faith with Seller to accept reasonable requests.

B.  The Seller shall not impose any changes to the Product under this Agreement except in accordance with the Change Request Procedure described in Section 4C, unless such changes do not affect the form fit and function of the Products.

## 14.    PRODUCT REGULATORY COMPLIANCE

Seller represents that it is not aware of any specific government regulatory performance requirements relating to the Products other than those included in the Agreement or otherwise communicated from the Buyer to the Seller. If the Buyer refers the Seller to any such applicable regulatory requirements, then where applicable to the Seller, the Seller shall comply with the following, provided that any changes to the designs, terms of this Agreement and appendices attached hereto shall be subject to the Section 4C Change Request procedure:



| | MaxxPro MRAP Program | |
|---|---|---|
| | **Contract No: M67854-07-D-5032** | |
| | **Supply Agreement** | |



A.   Components or systems purchased from Seller that have specific government regulatory performance requirements that are included in the Agreement or other communication from the Buyer to the Seller will require Seller to provide evidence of compliance satisfactory to Buyer and the applicable governmental regulatory authority, in the form of a test report and/or engineering analysis, validating conformance to those specific requirements.

B.   Seller must provide the same evidence of compliance whenever a change is made to a particular component or system that affects the performance of that component or system in relation to a specific government regulatory performance requirement.

C.   Seller must provide an annual "Letter of Conformance" as required by Buyer.

**15.    PRICING, QUANTITY, REBATE AND FREIGHT DISPUTES**

A.   All pricing, payment, quantity, and freight debits, and rebate disputes between Buyer and Seller that Seller wishes to contest must be communicated in writing by Seller to the Buyer within the later of twelve (12) months of the date Seller ships the Product to Buyer or from the date that the dispute arises.  For quantity disputes, Seller must provide a copy of the relevant proof of delivery ("POD") that is stamped with the Buyer's forwarder's receipt number.

B.   Seller must provide ninety (90) days written notice to Buyer of any intention to stop shipment of Products as a result of a dispute set forth above.  Seller shall present its dispute to the Mediation Board, which will include two members from the Seller and three members from the Buyer no more than 30 days following the date of such notice.

**16.    INSPECTION OF PRODUCTS**

A.   All deliveries of Products shall be received subject to inspection and/or rejection in accordance with the Acceptance Test procedures/Final Inspection (ATP) set forth in the SOW attached hereto as **Appendix A**. For Products delivered at Seller's premises (under Section 2 above), the ATP shall be conducted in Israel. For Products delivered in the United States (under Section 2 above), the ATP shall be conducted at the place of delivery. The parties shall coordinate the timing of the ATPs for their quality control managers to attend. Where Products pass the ATPs, the parties QC managers shall sign the COC attached hereto as **Appendix E**. If the Buyer's QC manager does not attend, then the Seller's QC manager shall sign the COC in the name of the Buyer. Defective Products or Products not passing the Acceptance Tests will be repaired or replaced and re-subjected to ATP. Payment for Products prior to inspection shall not constitute an acceptance thereof.

B.    If the Buyer finds on arrival at its premises that any parts are missing from the applicable packing list, then it shall notify the Seller thereof and the Seller shall, at the Seller's expense, express deliver the missing parts to the Buyer. Note that due to schedules the Buyer and Seller may negotiate the purchase of the missing part locally at the Seller's expense.  The Buyer's representative may inspect Seller's packing procedures.



| | MaxxPro MRAP Program |  |
|---|---|---|
| PLASAN **sasa** | **Contract No: M67854-07-D-5032** |  |
| *Composite Materials* | **Supply Agreement** | |

**17.**          **[Reserved]**

**SELLER PERFORMANCE**

**18.**          **PERFORMANCE ACHIEVEMENT**

Seller is required to meet all cost, performance, delivery, reliability, quality and technology requirements, and documentation thereof, as specified in this Agreement. Buyer's plants, Parts Distribution Centers or Supply Manager will communicate non-conformances directly to Seller with requests for corrective actions. These corrective actions must be performed in a timely manner and the issues corrected to the reporting location's satisfaction. All non-conformances will be subject to the charges as detailed in Appendix I – NON-CONFORMANCE CHARGE SCHEDULE, provided that the Buyer has notified the Seller in writing of the non-conformance and failed to cure the non-conformance within a reasonable time that shall not be more than 15 days of receipt of such notice. Such charges shall be in lieu of any other damages that the Buyer would otherwise be entitled to with respect to such non-conformance.

**19.**          **[RESERVED]**

**20.**          **SUPPLY FAILURE**

In the event of a partial failure of Seller's sources of supply for the Products purchased, Seller will first meet all of Buyer's requirements hereunder prior to any allocation among customers under Section 2-615 of the Uniform Commercial Code unless the Customer's rating of its order from the Buyer provides otherwise.

**21.**          **LATE DELIVERY CHARGES**

If Buyer determines that Seller's deliveries are so far behind a given schedule that Buyer requests express shipments, Seller will pay the express charges. If Seller's deliveries are so far behind a given schedule that the Buyer is compelled to use material not according to Buyer's specification, or at a higher cost, the Seller will pay only the charges in accordance with **Appendix I**.

**22.**          **[RESERVED]**

**23.**          **REIMBURSEMENT FOR NON-PERFORMANCE BY SELLER**



| | MaxxPro MRAP Program |
| --- | --- |
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



A.   Seller acknowledges that Buyer requires on-time delivery in order to operate its plants and parts distribution centers. The parties further acknowledge that the precise amount of Losses (as defined in Article 45 - INDEMNIFICATION) which Buyer would sustain in the event Seller were to fail to make timely or conforming deliveries of Products would be difficult to determine. Therefore, subject to as otherwise provided for herein, the parties agree that Seller shall be responsible for paying the liquidated damages Appendix I– NON-CONFORMANCE CHARGE SCHEDULE if Seller fails to make timely or conforming deliveries of Products. Seller will advise Buyer immediately in writing of any apparent imminent problem, and the parties will each use their best efforts to avoid any actual assembly line downtime. In addition, Seller shall not be responsible for any consequential or incidental Losses of whatsoever nature, including assembly line downtime charges for delinquent delivery resulting from schedule changes by Buyer or Buyer's unforeseen manufacturing difficulties.

B.   Seller shall promptly notify Buyer in writing of any anticipated labor dispute or labor shortage or any other labor performance interruption, and Seller shall arrange for advance deliveries or warehousing, at Buyer's option and at locations acceptable to Buyer, of a sixty (60) day supply of Products. Seller agrees to provide Buyer with its plan to continue production and support Buyer with Product in the event of a labor dispute, shortage, interruption, or contract expiration ninety (90) days before such event. Seller also agrees to keep Buyer informed of the status of negotiations toward renewal of any union contract or agreement. In the event that a labor dispute, shortage, interruption, or contract expiration occurs and Seller is unable to provide Buyer Product in accordance with this Agreement, Buyer may, at its option, and in addition to any other rights Buyer may have, procure alternate products from an alternate source. In the event that a labor dispute, shortage, interruption, or a contract expiration lasts more than sixty (60) days and Seller is unable to provide Buyer Product in accordance with this Agreement, Buyer may, at its option, and in addition to any other rights Buyer may have, terminate this Agreement.

C.   Buyer and Seller shall agree to the delivery performance targets as stated in the **Appendix C** Delivery Schedule, and the associated performance charges, for shipments to Buyer's Parts Distribution Centers (PDC's), contract packagers, and/or freight forwarders.

**24.         WARRANTY**

A    The Seller hereby warrants to the Buyer only that, for a period of 2 years for opaque armor and 1 year for transparent armor from the date of delivery of the Products to the Buyer (the "**Warranty Period**"), the Products shall be free and clear of defects in design, material and workmanship. The Seller's sole and exclusive responsibility under this warranty shall be to repair or replace any defective part of the Product, or the Product, as the Seller shall choose at its sole and absolute discretion, provided that the defect was not caused by (i) misuse of the Product or handling, assembly, disassembly, or storage of the Product other than in compliance with all instructions provided to the Buyer; (ii) alterations, changes, modifications, repairs and the like to any part of the Product other than by authorized personnel of the Seller; (iii) subjecting Product to accident or to any form of attack, including without limitation ballistic attack; (iv) normal wear and tear of the Product.

 

| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |

B  To claim under the warranty, the Buyer shall be required to notify the Seller in writing of the defect within 30 days of the defect arising, providing full descriptive details of the defect and the manner in which it was discovered. Where the Seller requires, the Buyer shall promptly send the defective item to the Seller's premises, or allow the Seller's representatives with access to the defective item. In case of shipments, the Seller shall bear shipment costs to Buyer and the Seller shall bear shipment costs to Seller, unless Seller can demonstrate to Buyer that the defect is not due to Seller's warranty obligation.  Note that due to schedules the Buyer and Seller may negotiate the purchase of the missing part locally at the Seller's expense.

C  Where possible, the Seller shall pass on to the Buyer the benefit of any warranties it receives from manufactures of those parts of the Product not manufactured by the Seller (which for the avoidance of doubt, includes the transparent armor). Where such warranties may be passed on, the Seller will provide the Buyer with copies of the warranty terms so that the Buyer may comply with those terms in order not to invalidate such warranties. Seller bears no other responsibility for any parts not manufactured by it.

D  The parties shall exert their best efforts in order to minimize the extra expenses involved in returning the defective Product to the Seller and to this end shall use any kind of technological assistance (such as digital photography, tele-conferencing, etc.) available to them.

## 25. WARRANTY CLAIMS; SERIAL DEFECTS;

A.  In the event that a Product fails at an extraordinary rate and results in Buyer issuing an Authorized Field Change or a Safety Recall, Seller will reimburse Buyer for reasonable expenses associated with administering the Authorized Field Change or Safety Recall. For the purpose of this Agreement, the term "extraordinary rate" shall mean the rate of identical default in Products in such numbers that the Buyer is obligated to issue an Authorized Field Change or a Safety Recall under the Prime Contract, or return of 50% of the Products supplied, due to identical default.

B.  If Buyer agrees to reimburse a Customer for product failures beyond the warranty period or terms in order to show good will and maintain customer satisfaction, Seller agrees to negotiate in good faith with Buyer regarding reimbursement for these expenses to Buyer on a case-by-case basis.

C.  If the Seller disputes its responsibility for a claim under the warranty it must do so in writing within sixty (60) days of notice of such claim and provide details to support such denial.



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



**26.        FINANCIAL VIABILITY**

Subject to the execution of non disclosure agreement between the Seller and Buyer's mother company (International Truck and Engine Corporation) and the Buyer, Seller shall provide within 30 days from approval thereof, the following reports:

A        to International Truck and Engine Corporation - yearly audited financial statements.

B        to Buyer – annual Balance sheet.

**27.        [RESERVED]**

**28.        [RESERVED]**

**29.        [Reserved]**

**30.        VALUE SELLING**

Buyer has a Brand Promise which is "*INTERNATIONAL listens, understands, and delivers the best ways to move our Customers ahead. On the road and in their business.*" Seller is required to provide a value statement to the Buyer upon request. The value statement should describe the value to the Buyer's Customers that the Seller's Product provides over their competitor's product.

**ENGINEERING/TECHNICAL SUPPORT**

**31.        [RESERVED]**

**32.        COMPLIANCE WITH CONTROLLED REVISIONS OF ENGINEERING SPECIFICATIONS**

In addition to the requirements set forth in Article 33 – ENGINEERING SPECIFICATION AND PRODUCT COMPLIANCE, Seller must assure that Products comply with the most current controlled revisions of Buyer's Engineering Material Specifications ("CEMS"), Truck Material Specification ("TMS"), or Engineering Standard Parts as defined in Statements of Work ("SOW"), Specification Transmittals, prints, models, and math data. Information Handling Services Inc., or other firm identified by Buyer, shall be the sole source for controlled copies of the foregoing documents and Seller is responsible for ensuring that it obtains controlled copies for the duration of the term of this Agreement in order to assure compliance with the most current documents. Notwithstanding anything to the contrary, the above shall not apply to the following



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



items: (i) off the shelf items; or (ii) armour materials; or (iii) product designed or developed independently by the Seller

**33.    ENGINEERING SPECIFICATION AND PRODUCT COMPLIANCE**

A.    TRUCK GENERAL REQUIREMENTS.  Seller must do the following:

 i. Meet requirements as defined in Statements of Work ("SOW"), Specification Transmittals, prints, models, and math data.

 ii. Assure that Wiring System Sellers are capable of supplying and receiving CAD data in NDP, with the ability to transition to a Saber/Unigraphics ("UG") based CAD system in conjunction with Buyer. Buyer acknowledges that Seller is utilizing Solid H software

 iii. Supply top level Unigraphics (UG) compatible 3D engineering CAD data and drawings. For all items listed in Annex B (BOM V.5) to Appendix A (SOW).  Reference Article 34 - TRUCK ENGINEERING CAD/CAM SUPPLIER DESIGN DATA REQUIREMENTS.  Should the Customer require further drawings at other levels, the Parties shall negotiate the request in good faith in order to comply with the request taking into consideration, amongst other things, Seller's confidential information which the Seller does not reveal.

 iv. Have the capability of and use electronic data exchange for engineering and CAD data throughout the life of the development program and for production maintenance.

 v. Use quality tools where warranted in the development of Buyer components, such as, but not limited to, FEA (Finite Element Analysis), DVP&R's (Design Verification Plans and Reports), DFMEA (Design Failure Mode and Effects Analysis), PFMEA (Process Failure Mode and Effects Analysis), and must provide raw data, test reports, and detailed FMVSS Compliance reports for all tests as needed.

 vi. Provide on-site supplier engineers during the Product Development Process if requested by Buyer's engineers.

 vii. Have production intent prototype parts development capability.

C.    SERVICE PARTS.  Seller must do the following:

 i. Seller must furnish, at Buyer's request, bills of materials, specifications and drawings regarding components and subassemblies associated with complete parts and assemblies supplied for Buyer's production requirements.



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



**34.** **TRUCK ENGINEERING CAD/CAM SUPPLIER DESIGN DATA REQUIREMENTS**

Buyer requires that Seller adhere to acceptable levels of CAD/CAM data as outlined in Buyer document TEM-PR-7.03 and is deemed part of this Agreement.

**35.** **[RESERVED]**

**36.** **INFORMATION TECHNOLOGY**

A. Seller may adopt information technology capability that enables them to electronically access Buyer via the International Supplier Network ("ISN") website: http://www.internationalsupplier.com/.

B. Seller may participate in any and all systems made available via ISN. This includes but is not limited to current systems such as eSPEC, (electronic RFQ) and COMPASS, or planned systems such as eQuote (electronic quote), collaborative design tools, supplier profile, etc.

**37.** **QUALITY REGISTRATION**

Seller is ISO 9001:2000 certified.
Buyer accepts Seller's certification. The Parties will fulfill all Seller and Buyer agreed PPAP (Production Part Approval Process) documentation and approval requirements. Seller must maintain its certification with an accredited registrar and must furnish copies of registration certificates to the Buyer's Supply Manager upon request.

**LEGAL/REGULATORY**

**38.** **COMPLIANCE WITH LAWS AND REGULATIONS**

Seller shall comply with those laws and regulations of the USA that are applicable thereto.

**39.** **NON-COMPLIANCE CHARGES**

Any instance of Seller's exception to or non-compliance with any of the requirements set forth in this Agreement will result in a standard non-negotiable and non-reversible charge back per occurrence. See Appendix I - NON-CONFORMANCE CHARGE SCHEDULE for specific non-compliance charges.

**40.** **MATERIAL SAFETY DATA SHEETS (MSDS)/SUBSTANCE RESTRICTIONS**

A. Seller shall properly classify, describe, package, mark, label and provide Material Safety Data Sheets ("MSDS") for approval by Buyer prior to the initial shipment of all Products, provide a new MSDS each time there are any changes to the Product that affect the MSDS. Subject to section 46 herein below, Seller will defend, indemnify and hold harmless Buyer from any claims, penalties, or damages incurred by Buyer as a result of any Product received from Seller not in agreement with the current MSDS provided to Buyer.



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



B.  Seller is expected to eliminate lead ("Pb") unless required by Buyer's specification, mercury ("Hg"), cadmium ("Cd") and hexa-valent chromium ("Cr VI") from its Products. Seller will provide written notification of its action plans to Buyer to eliminate these four heavy metals from its Products within six (6) months of the signing of this Agreement.

C.  If the Seller's parts are subsequently incorporated into Buyer's Customers' products, and if these Customers have specific material and/or substance reporting and management requirements, Buyer will cascade these requirements down to Seller and expects Seller to further cascade the requirements down to its sub-tier suppliers. Seller has to achieve the specific material and/or substance reporting and management requirements as part of the Buyer and Seller agreed upon Production Part Approval Process (PPAP). Any changes in the use of substances or concentrations of the substances as a result of engineering changes requires pre-approval from Buyer and may require re-approval of the PPAP process.

**41.**     **[RESERVED]**

**42.**     **[RESERVED]**

**43.**     **GOVERNMENTAL REQUIREMENTS**

Seller agrees to comply with all applicable statutes, regulations, laws and other Government requirements, including but not limited to, 48 C.F.R. Sections 52.219-8 (Utilization of Small Business Concerns), 52.222-26 (Equal Employment Opportunity), 52.222-35 (Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans), 52.222-36 (Affirmative Action for Workers with Disabilities), 52.222-39 (Notification of Employee Rights Concerning Payment of Union Dues or Fees), 52.222-41 (Service Contract Act of 1965), 52.232.32 (Performance Based Payments) and 52.247-64 (Preference for Privately Owned U.S.- Flag Commercial Vessels), see Appendix F for full list of FAR and DFAR requirements. The term "Contractor" and similar terms used in such FAR provisions shall be construed to mean Seller for the purposes of this Agreement.

**44.**     **DIRECT PAYMENTS**

Buyer reserves the right to make payments directly to bankruptcy courts, trustees in bankruptcy or receivers, as it deems necessary. Any amounts paid by Buyer to the entities or persons listed in this paragraph other then Seller will be subtracted from any amounts owed to Seller under this Agreement. Buyer reserves its right to any other remedies allowed in law or equity.

**45.**     **INDEMNIFICATION**

A.  <u>Indemnification by Seller</u>. Subject to Section 46 below, Seller agrees to protect, defend, hold harmless and indemnify Buyer, its officers, directors, dealers, employees, agents and affiliates, against all claims, actions, suits, proceedings, demands (collectively, "Claims"), including all liabilities, losses, costs, expenses (including all



| | MaxxPro MRAP Program |
| --- | --- |
| | *Contract No: M67854-07-D-5032* |
| | *Supply Agreement* |



legal costs and expenses) and all judgments, settlements and judicially or administratively imposed damages (including all consequential damages) (collectively with Claims, "Losses"), resulting directly from:

    i.    Any breach or violation of Seller's representations, covenants or agreements under this Agreement except for those breaches or violations giving rise to the charges detailed in Appendix I - NON-CONFORMANCE CHARGE SCHEDULE;

    ii.    Any alleged negligence, gross negligence, recklessness, willful misconduct or fraud on the part of Seller and/or its Affiliates or any employee, subcontractor or agent of theirs related to this Agreement, or;

    iii.    Any property damage or personal injury, including death, attributed to, in whole or in part, a defect in the design, materials, or workmanship of Seller's Products or occurring in connection with the manufacture of such Seller's Products.

B.    <u>Indemnification by Buyer</u>.  Buyer agrees to protect, defend, and hold harmless, and indemnify Seller, its officers, directors, employees, agents, and affiliates, against all Losses, resulting directly from:

    i.    Any breach or violation of Buyer's representations, covenants or agreements under this Agreement;

    ii.    Any alleged negligence, gross negligence, recklessness, willful misconduct or fraud on the part of Buyer and/or its Affiliates or any employee, subcontractor or agent of theirs related to this Agreement, or;

    iii.    Any property damage or personal injury, including death, attributed to, in whole or in part, Buyer's negligent installation or use, or both, of Seller's Products.

C.    <u>Intellectual Property Indemnity</u>.  Seller agrees to defend, at its sole expense, any Claim against Buyer, its officers, directors, employees, agents and affiliates based on an assertion or Claim that any Product furnished by Seller to Buyer hereunder or the use or sale by Buyer or its Customers in the manner contemplated by this Agreement infringes any patent or copyright or other intellectual property right or is a wrongful use of third-party trade secret or proprietary information, and further agrees to indemnify and hold Buyer harmless from any Losses, including attorneys' fees, settlements associated with said Claim, or any Losses, including attorneys' fees or costs, finally awarded in any such Claim.  If the use or sale of any Product furnished pursuant to this Agreement is enjoined as a result of such Claim, Seller, at its option and at no expense to Buyer, shall obtain for Buyer and its Customers the right to use and sell the Product(s) or shall substitute an equivalent product(s) acceptable to Buyer and extend this indemnity thereto.  This indemnity does not extend to any Claim based on any infringement of any patent by the combination of Product(s) furnished by Seller with other components added thereto by Buyer, except when the Product(s) is a material part of the invention of an asserted patent and the components furnished by Buyer to complete the claimed combination, such as an engine, sensor, or vehicle frame are not novel within the meaning of the patent or are specified or approved by Seller.  This indemnity does not extend to any infringement or alleged infringement arising solely out of Seller's compliance with Buyer-required specifications, designs, or instructions that (i) are created solely by Buyer and (ii) are thereafter furnished to Seller in writing.



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



D.  <u>Collaborative Efforts</u>.  In the event that a Claim should be made based upon a design defect and the design was a collaborative effort, Seller and Buyer shall cooperate fully in the defense of this matter, sharing in all Losses related to such Claim, provided each party will contribute to the aggregate Losses arising from such Claim in a proportion reflecting to the relative and comparative responsibilities of the parties for such Losses, as well as any other relevant equitable considerations.

E.  <u>Notice of Indemnification</u>.  No Claim under this Section 45 shall be valid unless notice of the matter which may give rise to such Claim is given in writing by the indemnitee (the "Indemnitee") to the persons against whom indemnification may be sought ("Indemnitor") as soon as reasonably practicable after such Indemnitee becomes aware of such Claim.  Failure of the Indemnitee to notify the Indemnitor within such notice period shall not relieve Indemnitor of any liability hereunder, except to the extent the Indemnitor reasonably demonstrates that the defense of such third party claim is materially prejudiced by such failure.  Such notice shall state that the Indemnitor is required to indemnify the Indemnitee for a Loss and shall specify the amount of Loss, if available, and relevant details thereof.  The Indemnitor shall have the right to assume the defense of any such claim and shall notify Indemnitee within a reasonable time from such notice of its intention to assume the defense of any such claim, which consent shall not be unreasonably withheld or delayed.

**46.**　　**LIMITATION OF LIABILITY; INSURANCE**

A.  Notwithstanding anything to the contrary stated herein, the Seller does not provide any warranties other than those specifically stated herein and all other warranties, whether express or implied are excluded here from.

B.  EXCEPT FOR LIABILITY UNDER SECTION 45C ABOVE RELATED TO THE DESIGN OF THE PRODUCT WHICH SHALL NOT BE LIMITED, ALL OTHER SELLER'S LIABILITIES WITH REGARD TO THE PRODUCTS SHALL BE LIMITED TO REPAIR OR REPLACEMENT IN ACCORDANCE WITH THE WARRANTY PROVIDED IN ARTICLE 24 – WARRANTY. WITHOUT DEROGATING FROM THE GENERALITY OF THE ABOVE, ANY OTHER LIABILITY OF THE SELLER OF WHATSOEVER NATURE RELATING TO OR DERIVING FROM OR IN CONJUNCTION WITH THIS AGREEMENT SHALL BE LIMITED TO THE AGGREGATE AMOUNT OF US$ 10,000,000 (TEN MILLION US DOLLARS). IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, CONSEQUENTIAL, OR PUNITIVE CLAIMS OR DAMAGES INCLUDING WITHOUT LIMITATION, CLAIMS FOR DAMAGES FOR LOSS OF USE, LOSS OF REVENUES OR LOSS OF PROFIT, WHETHER OR NOT THE DAMAGED PARTY WAS ADVISED OF THE POSSIBILITY THEREOF.

C   SELLER'S LIABILITY WITH REGARD TO EVENTS COVERED BY THE POLICIES (THE "INSURANCE EVENTS") SHALL BE LIMITED TO THE INSURANCE COVRAGE. THE SELLER SHALL BE RESPONSIBLE TO PAY THE PREMIUM ON THE POLICIES. UPON THE OCCURRENCE OF AN INSURANCE EVENT, THE SELLER'S LIABILITY TO THE BUYER SHALL BE LIMITED TO THE MAXIMUM COVERAGE PROVIDED IN THE POLICIES FOR SUCH EVENT AND SUBJECT TO THE TERMS OF ITS COVERAGE. THE SELLER SHALL NOT BE REQUIRED TO PURCHASE ANY INSURANCE OTHER THAN AS SPECIFIED HEREIN. ANYTHING TO THE CONTRARY HEREIN OR IN ANY RELEASE SHALL NOT APPLY AND IS SPECIFICALLY DECLARED VOID. IN NO EVENT SHALL THE



| | MaxxPro MRAP Program | |
| --- | --- | --- |
| | **Contract No: M67854-07-D-5032** |  |
| | **Supply Agreement** | |

SELLER BE LIABLE TO THE BUYER FOR ANY INDIRECT OR CONSEQUENTIAL CLAIMS OR DAMAGES INCLUDING WITHOUT LIMITATION, CLAIMS FOR DAMAGES FOR LOSS OF USE, REVENUE OR PROFIT, WHETHER OR NOT THE SELLER WAS ADVISED OF THE POSSIBILITY THEREOF.

D     The Seller shall provide the Buyer with its existing insurance policies (the "Policies"). During the Term of this Agreement, Seller shall maintain at its own expense Commercial General Liability Insurance with limits of no less than US$ 5,000,000 per occurrence and US$ 5,000,000 general aggregate for death, bodily injury, and property damage.

Seller shall also maintain Workers' Compensation Insurance per applicable statutory requirements.

Such policies shall name Buyer as an additional insured with regard to the Commercial General Liability Insurance. Such policies shall provide that thirty (30) days written notice shall be given to Buyer prior to cancellation or material changes to the policies. Any such change, modification or cancellation shall not affect Seller's obligation to maintain the insurance coverage set forth above.

As of its execution of this Agreement, Seller shall provide Buyer with a certificate of insurance evidencing such coverage. Failure to provide such certificate of insurance shall void this Agreement, at Buyer's sole option.

E     During the Term of this Agreement, Buyer shall maintain at its own expense Commercial General Liability Insurance with limits of no less than US$ 10,000,000 per occurrence and US$ 5,000,000 general aggregate for death, bodily injury, and property damage. The Buyer shall name the Seller as an additional insured with regard to the Commercial General Liability Insurance.

## 47.   REMOVAL OF IDENTITY OF BUYER

At its own expense Seller agrees to destroy or remove to the Buyer's complete satisfaction Buyer's corporate name, addresses, trademarks, patent numbers, and all other references to Buyer from all Products rejected or canceled by Buyer, or purchased or produced by Seller in excess of quantities specified by Buyer, whether such Products are completed or partially completed, delivered, tendered for delivery, or undelivered, prior to disposition of such Products to parties other than Buyer, or to destroy such Products. Seller acknowledges that any sale of Products bearing the Buyer's trade name and/or trademarks to any person or entity other than Buyer is an infringement of the Buyer's proprietary rights in its trade name and/or trademarks and is an attempt by Seller to "pass off" products of others as the products of Buyer. Without first obtaining the written consent of Buyer, Seller agrees that it shall not in any manner make known the fact that Seller has furnished, or contracted to furnish, Buyer the Products covered by this Agreement, or use the name of Buyer or any of its trademarks or trade names in Seller's advertising or other promotional material.



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



**48.**      **NEW BUSINESS**

Buyer shall negotiate with Seller in good faith with regard to placing new production business of Buyer with Seller if, in Buyer's opinion, Seller is competitive in the areas of price, performance, delivery, reliability, technology and quality with other manufacturers of any such products. Both Buyer and Seller shall work together to develop target costs and establish the lowest possible cost of any new product. Seller agrees to provide all price/cost submissions with full cost transparency throughout the iterative design process. Seller shall also specify tooling and production lead times in the quotation. Nothing in this Article 48 – NEW BUSINESS shall be construed as an obligation on the part of Buyer to develop or purchase any products other than those Products covered by this Agreement.

**49.**      **CONFIDENTIAL INFORMATION / INTELLECTUAL PROPERTY**

A.      During the term of this Agreement, each party hereto may disclose to the other certain confidential information relating to the manufacturing, sale, marketing, development or distribution of the Product(s), the application of the Product(s) by Buyer, processes, trade secrets and business and financial information and marketing plans of either party as well as confidential information (which may be in electronic form, as well) resulting from the performance of this Agreement, including, without limitation, purchase orders, sales projections, customer lists, designs under development, intellectual property and know-how. Any such information that is marked or otherwise clearly identified at the time of disclosure as "confidential" or "proprietary" or any information which a person would reasonably deem to be confidential information of the parties under the circumstances shall be considered as "Confidential Information" for purposes of this Agreement, provided that, if the information is disclosed orally, a writing identified as "confidential" or "proprietary" and summarizing the Confidential Information will be provided within thirty (30) days after disclosure. During the term of this Agreement and for a period of ten (10) years after the expiration or termination of this Agreement, the receiving party shall not disclose such Confidential Information of the other to third parties and will not use such Confidential Information for any purpose other than to effectuate the provisions of this Agreement. The recipient shall use best efforts to protect the confidentiality of the Confidential Information, where "Best efforts" with respect to any Confidential Information means at least that degree of care normally used by the receiving party to prevent disclosure to others of its own confidential information of similar importance, but in no case less than a reasonable degree of care. The recipient shall not reverse engineer, decompile or breakdown the other party's Confidential Information into its component parts and shall not copy the Confidential Information except as permitted in writing by the disclosing party. Notwithstanding the foregoing, Seller and Buyer agree that Confidential Information shall not include any information which: (a) is or becomes publicly known through no wrongful act on the receiving party's part; or (b) is, at the time of disclosure under this Agreement, already known to the receiving party without restriction on disclosure; or (c) is, or subsequently becomes, rightfully and without breach of this Agreement, in the receiving party's possession without any obligation restricting disclosure; or (d) is independently developed by the receiving party without reference to or use of the Confidential Information. Where the recipient is required to disclose the other party's Confidential Information pursuant to an order of any governmental or judicial authority, then the recipient shall be entitled to comply



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



therewith after reasonable prior notice to the disclosing party respecting such order, and affording the disclosing party reasonable cooperation respecting any objections by the disclosing party to the request for disclosure, including a reasonable opportunity for the disclosing party to obtain a protective order in respect to the Confidential Information at the expense of the disclosing party and for all other purposes, such information disclosed under the order shall remain Confidential Information.

B.  Upon request of the disclosing party at any time, the recipient agrees to return to the disclosing party or destroy all materials in its possession or control which contain Confidential Information of the disclosing party, including, without limitation, documents, drawings, CAD drawings, computer media, models, prototypes, sketches, designs, and lists furnished by the disclosing party or accessed by the recipient, including copies thereof made by the recipient, and to delete from its computers any software, data files, or CAD files containing Confidential Information furnished by the disclosing party.  If materials are destroyed, an officer of the recipient shall identify such materials to the disclosing party and certify that their destruction has been completed.  Notwithstanding the foregoing, each party shall be entitled to maintain one archival copy of the Confidential Information within its Law Department or at the office of its General Counsel, such archival copy to be used solely in connection with resolving claims or disputes between the parties relating to this Agreement.

C.  Seller is granted a limited trademark license to use the International logo and word mark, and any other trademarks owned by International or its wholly-owned affiliates, International Truck Intellectual Property Company LLC and International Engine Intellectual Property Company LLC, solely as necessary to fulfill the terms of this Agreement and for no other purpose.  Buyer reserves the right to review and approve or disapprove all uses of the licensed trademarks.

D.  This Article 49 – CONFIDENTIAL INFORMATION / INTELLECTUAL PROPERTY, shall survive the termination or expiration of this Agreement.

E.  In regards to developments the Parties agree to the following

    i.  all inventions, discoveries, computer programs, algorithms, technical data and information resulting under this Agreement made or conceived by Seller, its employees, contractors or subcontractors that relate solely to armoring technology and materials or that are developed by the Buyer using any part of the Seller's Confidential Information (the "Seller's Developments") shall at all times vest solely and exclusively in the Seller, and

    ii.  all inventions, discoveries, computer programs, algorithms, technical data and information resulting under this Agreement made or conceived by Buyer, its employees, contractors or subcontractors that relate to other than armoring technology and materials or that are developed by the Seller using any part of the Buyer's Confidential Information (the "Buyer's Developments") shall at all times vest solely and exclusively in the Buyer.

**50.     TERMINATION**

A.  <u>Termination by Buyer</u>. In the event that the Customer terminates the Prime Contract for the Customer's convenience, in accordance with the applicable FAR regulation



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



(52.249-2), the Buyer shall have the right to terminate this Agreement for convenience. In such case the terms of FAR 52.249-2 shall apply accordingly.

B.   <u>Termination For Default</u>:  neither party shall terminate this agreement for default. The parties shall remedy any default in the most expedite manner possible and shall negotiate in good faith any equitable adjustment derived from such default.  Should either party default in performing any of its material obligations hereunder, the other party may give written notice to the defaulting party of default giving the full details thereof.  If the defaulting party fails within reasonable period, which shall in no event exceed thirty (30) days of the receipt of written notice of default to cure the default, then the Parties CEOs shall agree on the corrective plan.  Notwithstanding the aforementioned if the Customer terminates the Prime Contract for Default then Buyer may: i) terminate the Agreement for Default if the default is attributed to Seller's Default; or ii) terminate the Agreement for Convenience (FAR 52.249-2) if the default is not attributable to Seller's Default.

C.   <u>Rights and Obligations of Parties</u>.  Except as otherwise provided for herein, the termination of this Agreement for any reason shall be without prejudice to (without acting as a limitation):
   i.    Either party's obligations of confidentiality provided for in Article 49 – CONFIDENTIAL INFORMATION / INTELLECTUAL PROPERTY;
   ii.   Either party's right to receive all payments (including any amounts provided for in Article 5 - PRICING hereof) accrued hereunder prior to the date of such termination; and
   iii.  Any other remedies which either party may then or thereafter have hereunder or under law, equity or otherwise.

D.   <u>Survival</u>.  Any termination or expiration of all or part of this Agreement shall not relieve either party of obligations incurred pursuant to and during the Term hereof prior to such termination or expiration of this Agreement, including but not limited to the warranty provisions set forth in Article 24 - WARRANTY hereof, the Indemnification provisions of Article 45 - INDEMNIFICATION hereof, and the Confidential Information provisions set forth in Article 49 - CONFIDENTIAL INFORMATION / INTELLECTUAL PROPERTY hereof.  Articles 23A – REIMBURSEMENT FOR NON-PERFORMANCE BY SELLER, 24 - WARRANTY, , 45 - INDEMNIFICATION, 47 – REMOVAL OF IDENTITY OF BUYER, 49 – CONFIDENTIAL INFORMATION / INTELLECTUAL PROPERTY, 50C and D – TERMINATION, 53 – CHOICE OF LAW, 54 – CONSENT TO JURISDICTION, , and 59 - NOTICES of this Agreement and any other provision, that by its terms is intended to survive, shall survive any termination or expiration of this Agreement.

# MISCELLANEOUS

## 51.    ASSIGNMENT OF RIGHTS AND DUTIES

Either party may assign the rights and duties under this Agreement, either in whole or in part, only with the prior written consent of the other party.  No permitted assignment hereunder shall be deemed effective until the assignee shall have executed and delivered an instrument in writing reasonably satisfactory in form and



| | MaxxPro MRAP Program |
| --- | --- |
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



substance to the other party pursuant to which the assignee assumes all of the obligations of the assigning party hereunder. Any purported assignment of this Agreement in violation of this Article 51 – ASSIGNMENT OF RIGHTS AND DUTIES shall be void. In order to avoid doubts, the Seller may assign the payments to which it will be entitled, to its Bank, and the Bank shall not need to issue any document, other then acknowledgment of receipt.

## 52. MODIFICATION AND AMENDMENT OF AGREEMENT

No modifications of, or additions to, the provisions or conditions of this Agreement (including the Exhibits, Appendices and Schedules hereto) will become a part of the Agreement until agreed to in writing by the Buyer and Seller. This Agreement (including the Exhibits, Appendices and Schedules hereto) may not be amended or modified without the written consent of both Buyer and Seller. For purpose of clarity, no Release may be amended, modified or altered without the written consent of Buyer and Seller. Notwithstanding the foregoing, the parties may agree to addenda to Contracts.

Such modifications will constitute a binding amendment.

## 53. CHOICE OF LAW

This Agreement shall be governed by and construed under the laws of the State of New York, without giving effect to the choice of law provisions thereof.

## 54. CONSENT TO JURISDICTION

All actions, proceedings, claims, counterclaims or cross-complaints in any action or other proceeding brought by any party hereto against any other party hereto with respect to any matter arising out of, or in any way connected with or related to, this Agreement or any portion thereof, whether based upon contractual, statutory, tortuous or other theories of liability arising out of or relating to this Agreement, shall be heard and determined in any federal court sitting in the Southern District of New York, New York, unless there is no federal court jurisdiction, in which case the action or proceeding shall be heard and determined in any state court sitting in the Southern District of New York, New York, and the parties hereto hereby irrevocably submit to the jurisdiction of such courts in any such action or proceeding, IRREVOCABLY AGREE THAT ANY SUCH COURT IS A PROPER VENUE FOR ANY SUCH ACTION, and irrevocably waive the defense of an inconvenient forum. Each party irrevocably consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process to such party at its address specified in Article 59 – NOTICES. Nothing in this Article 54 – CONSENT TO JURISDICTION shall affect the right of any party hereto to serve legal process in any other manner permitted by law.

## 55. SEVERABILITY

In the event that any provision of this Agreement or the application thereof to any party of circumstance shall be finally determined by a court of proper jurisdiction to be invalid or unenforceable to any extent, then (i) a suitable and equitable provision shall



| | *MaxxPro MRAP Program* |
|---|---|
| | ***Contract No: M67854-07-D-5032*** |
| | ***Supply Agreement*** |



be substituted therefore in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid and unenforceable provision, and (ii) the remainder of this Agreement and the application of such provision to the parties or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby.

**56.    INJUNCTIONS; SPECIFIC PERFORMANCE**

The provisions of each Article of this Agreement are not intended to limit any rights and remedies of the Seller or Buyer at law or in equity. Each of the parties acknowledges and agrees that the other party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each of the parties agrees that the other party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court having jurisdiction over the parties and the matter (subject to the provisions set forth in Article 54 – CONSENT TO JURISDICTION above), in addition to other remedy to which they may be entitled, at law or in equity.

**57.    FORCE MAJEURE**

A.    Except as described below, neither party shall be liable for any failure or delay in the performance of its obligations under this Agreement to the extent this failure or delay both:

   i.    Is caused by any of the following: acts for war, terrorism, civil riots, or rebellions; quarantines, embargoes, and other similar unusual governmental action; extraordinary elements of nature or acts of God; and

   ii.    Could not have been prevented by the non-performing party's reasonable precautions or commercially accepted processes (including, but not limited to, implementation of disaster recovery and business continuity plans in accordance with industry best practices), or could not reasonably be circumvented by the non-performing party through the use of substitute services, alternate sources, work-around plans, or other means by which the requirements of a buyer of products substantively similar to the product hereunder would be satisfied.

Events meeting both of the above criteria are referred to as "Force Majeure Events." The parties expressly acknowledge that Force Majeure Events do not include vandalism, labor strikes, lockouts, labor difficulty (except in each case where the general labor force is effected) or the non-performance of third parties or subcontractors relied on for the delivery of the Product unless such failure or non-performance by a third party or subcontractor is itself caused by a Force Majeure Event, as defined above. Upon the occurrence of a Force Majeure Event, as long as the non-performing party provides the other party written notice of the Force Majure event within ten (10) days of its occurrence, the non-performing party shall be excused from any further performance or observance of the affected obligation(s) for as long as such circumstances prevail, and such party continues to attempt to recommence performance or observance to the greatest extent possible without delay.

 

| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |

B.  Notwithstanding any other provision of this Article, a Force Majeure Event shall obligate Seller to begin and successfully implement all services relating to disaster recovery set forth in a "Disaster Recovery Plan" as may be specifically requested by Buyer.  If a Force Majeure Event causes a material failure or delay in the performance of any Seller obligation with respect to any Product, Buyer may, at its option, and in addition to any other rights Buyer may have, procure alternative product from an alternate source until Seller is again able to provide such Products.  If a Force Majeure Event causes a material failure or delay in the performance of any Seller obligation with respect to any Product for more than two (2) consecutive months, Buyer may, at its option, and in addition to any other rights Buyer may have, terminate this Agreement

## 58.    ENTIRE AGREEMENT

This Agreement, together with and the Exhibits, Appendices and Schedules attached hereto (and thereto), embodies and sets forth the entire agreement and understanding of the parties with respect to the subject matter herein and there are no promises, terms, conditions or obligations, oral or written, expressed or implied, other than those contained in this Agreement.  The terms of this Agreement shall supersede all previous oral or written agreements which may exist or have existed between the parties relating to the subject matter of this Agreement.  No party shall be entitled to rely on any agreement, understanding or arrangement which is not expressly set forth in this Agreement.  Any amendments to this Agreement must be in writing and signed by the parties to this Agreement.

## 59.    NOTICES

A.  Except as otherwise specifically provided, any notice or other documents to be given under this Agreement shall be in writing and shall be deemed to have been duly given if sent by registered mail or nationally recognized overnight courier to a party or delivered in person to a party at the address set out below for such party or such other address as the party may from time to time designate by written notice to the other:



| | |
|---|---|
| **PLASAN SASA** <br> *Composite Materials* | *MaxxPro MRAP Program* <br> **Contract No: M67854-07-D-5032** <br> *Supply Agreement* |



**If to Buyer:**   **International Military and Government, LLC**
4201 Winfield Road
P.O. Box 1488
Warrenville, IL 60555
Attn:   Archie Massicotte
Phone:   (630) 753-2603
Email:   archie.massicotte@nav-international.com

**With copies to:**
Attn:   General Counsel
Phone:   (630) 753-2502
Email:   steven.covey@nav-international.com

**If to Seller:**   **Plasan Sasa Ltd.**
Kibbutz Sasa, Meroam Hagalil, 13870 Israel

Attn:   Dani Ziv
Facsimile:   +972 4 6809001
Phone:   +972 4 6809000
Email:   danz@plasan.com

**With copies to:**
Attn:   Ofer Glusman, Adv.
Facsimile:   +972 3 6938680
Phone:   +972 3 6918686
Email:   oglusman@gclaw.co.il

B.   Any such notice or other document shall be deemed to have been received by the addressee fifteen (15) business days following the date of dispatch of the notice or other document by mail or, where the notice or other document is sent by overnight courier or by hand, simultaneously with the delivery. To prove the giving of a notice or other document it shall be sufficient to show that it was dispatched, unless it is proved that the notice was not received.

**60.**   **NO WAIVERS**

Neither the failure nor delay on the part of a party to require the strict performance of any term, covenant or condition of this Agreement or to exercise any right or remedy available on a breach thereof shall constitute a waiver of any such breach or of any such term or condition. The consent to, or the waiver of, any breach, or the failure to require the performance or timely performance of any term, covenant, or condition of this Agreement shall not be construed as authorizing any subsequent or additional breach and shall not prevent a subsequent enforcement of such term, covenant, or condition.

*N. L.*



| | MaxxPro MRAP Program |
|---|---|
| | **Contract No: M67854-07-D-5032** |
| | **Supply Agreement** |



**61.**     **CONSTRUCTION**

The language in all parts of this Agreement shall be construed, in all cases, according to its fair meaning. Buyer and Seller hereby acknowledge that each party hereto and its counsel have reviewed this Agreement. Whenever used herein, the words "include', "includes" and "including" shall mean "include, without limitation", "includes, without limitation" and "including, without limitation", respectively. The masculine, feminine or neuter gender and the singular or plural number shall each be deemed to include the others whenever the context so indicates. "Days" means calendar days unless other specified.

**62.**     **HEADINGS**

The headings used in this Agreement are for convenience only and are not a part of this Agreement nor affect the interpretation of any of its provisions.

**63.**     **COUNTERPARTS**

This Agreement may be executed simultaneously in counterparts (and may be delivered by facsimile), each of which shall be deemed an original, but all of which together shall constitute a single agreement.



**PLASAN SASA**
Composite Materials

MaxxPro MRAP Program
**Contract No: M67854-07-D-5032**
**Supply Agreement**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers or representatives as of the day and year first above written.

**BUYER: INTERNATIONAL MILITARY AND GOVERNMENT LLC**



Name: Archie Massicotte
Title: President

Date: August 7, 2007

**SELLER: PLASAN SASA LTD.**

Name: Dani Ziv
Title:  CEO

Azriel Biberstein
CFO

Date: August 7, 2007